MANHATTAN FACTORING CORP. *v.* ORSBURN.

5-3391                                      385 S. W. 2d 785

Opinion delivered January 18, 1965.

*Wayne W. Owens of Moses, McClellan, Arnold, Owen & McDermott,* for appellant.

*Dale L. Bumpers and Smith, Williams, Friday and Bowen,* By: *W. A. Eldredge, Jr.,* for appellee.

FRANK HOLT, Associate Justice. This appeal results from a business transaction between appellant and appellees. The appellees are in the poultry processing business.

For several years they had borrowed their necessary capital from a bank where their line of credit was $100,000.00. Two of appellees' customers became questionable credit risks. Upon advice of the bank, the appellees responded to appellant's advertisement offering to guarantee or purchase accounts receivable. After several conferences, the appellant and appellees entered into an "Accounts Receivable Agreement", also known as a factoring agreement.

Briefly, by the terms of this contract the appellant agreed to purchase without recourse from appellees their customer Hall's accounts not to exceed the credit limit of $50,000.00 provided Hall's failure to pay was due to his financial inability. As shipments were made by the appellees to their customer, Hall, copies of the invoices were mailed to the appellant. Upon receipt of such evidence of shipment the appellant deducted its factoring charge, or fee, of .85 of 1%. Also, 10% of the net amount of the invoice was deducted as a reserve fund to cover any refusal of Hall to pay an invoice because of reasons other than financial inability. The balance then was remitted to the appellees. A settlement of this temporary reserve fund account was required on or about the 1st or 15th of each month by an addendum to the contract.

After a duration of this agreement for about six months it became necessary for the appellees to discontinue shipment of its products to the customer, Hall, because of his delinquent payments. During this time appellat had purchased the Hall accounts to the total extent of approximately $250,000.00. Hall owed a balance of $39,356.72 when this litigation ensued. The appellees brought an action to recover from appellant the balance of the reserve fund totaling $20,128.68. Appellant admitted holding the reserve fund. By cross complaint the appellant alleged that the appellees owed appellant the $39,356.72 on six invoices which Hall had not paid. Appellant asserted that it had accepted and paid each of these six invoices at a time when the Hall guaranteed account exceeded the credit limitation of $50,000.00 and, therefore, the invoices were purchased with recourse or

at the client's risk. The appellant sought to retain and apply the reserve fund of $20,128.68 as a credit on the alleged indebtedness of $39,356.72 and then recover the balance from the appellees. A jury resolved the issues in favor of the appellees by awarding them the full amount of the accumulated reserve fund.

For reversal appellant first contends that the court erred in giving appellees' Instruction No. A. This instruction told the jury that since it was undisputed the contract between the parties was prepared by the appellant, if the jury found any portion of the contract equally susceptible of different interpretations, then the interpretation most favorable to the appellees should be adopted. This is a correct pronouncement of the law. Where a written contract is ambiguous in any respect, it is construed most strongly against the party preparing it and its meaning becomes a question of fact for the jury. *Travelers Indemnity Co.* v. *Hyde,* 232 Ark. 1020, 342 S. W. 2d 295; *Bailey* v. *Sutton,* 208 Ark. 184, 185 S. W. 2d 276; *Swift* v. *Lovegrove,* 237 Ark. 43, 371 S. W. 2d 129; *Pate* v. *Goyne,* 212 Ark. 51, 204 S. W. 2d 900; *Triska* v. *Savage,* 219 Ark. 80, 239 S. W. 2d 1018.

The appellant argues that the terms of the contract are plain and unambiguous and, therefore, it is not susceptible to different interpretations. We cannot agree. For example, in paragraph two of the disputed agreement the appellant agreed to bear the credit loss on an uncollected invoice if the customer [Hall] "fails to pay in part or full because of financial inability." In paragraph five, however, the contract provides that the appellant must make remittances on the appellees' reserve account on the first and fifteenth of each month "on all accounts receivable that have been completely collected." Thus, the ambiguity is obvious. The account might never be "completely collected" because of the debtor's "financial inability."

The guarantee of Hall's "accounts receivable" under certain conditions also results in the opposing theories of the appellant and the appellees. The appellant's

interpretation of the contract is that each invoice of the "accounts receivable" guaranteed must be treated separately and as each individual invoice was accepted it was or was not without recourse depending upon whether the $50,000.00 credit limit of the Hall account was exceeded at the time of its purchase by appellant. If in excess of the credit limit when the invoice was accepted, then that individual invoice was with recourse and remained so even though the Hall account was thereafter reduced below the $50,000.00 credit limit. There is language in the contract to this effect. On the contrary, the theory of the appellees is that under the contract the invoices were to be treated as "accounts receivable", or a running total of the invoices purchased by appellant and that the appellant is required to pay for all credit losses "on approved shipments" up to and including the $50,000.00 credit limit. In other words, appellees contend that they were responsible for the accounts receivable purchased by appellant only to the extent that the remaining unpaid balance was in excess of the credit limit. Appellees argue that the guarantee of "accounts" requires such interpretation. We think the trial court was correct in submitting to the jury the issue of ambiguity.

The appellant next asserts that the court erred in giving appellees' Instruction B and C. Instruction B constitutes appellees' interpretation or theory of the contract. It was, in effect, a statement of how the jury might construe the contract if it believed appellees' version that Manhattan was to guarantee the Hall accounts up to and including the $50,000.00 credit limit. Appellees' Instruction C fully and fairly covered the appellant's theory or interpretation of the agreement. Thus, by these two instructions the two opposing theories were fairly presented to the jury. Further, since the trial court held the contract ambiguous, it was the court's duty to submit to the jury these alternative instructions. *Agey* v. *Pederson,* 191 Ark. 497, 86 S. W. 2d 930; *Paepcke-Leicht Lbr. Co.* v. *Talley,* 106 Ark. 400, 153 S. W. 833. The court was correct in giving Instructions B and C.

We now consider appellant's points numbers 4, 5, 6, and 8A together. Appellant contends the court erred in refusing these instructions. The court properly rejected these instructions since, as stated by appellant, they were in effect requests for instructed verdicts. As stated previously, the court was correct in submitting to the jury the issue of ambiguity.

The appellant also argues in points 7 and 8 that the court erred in refusing appellant's requested Instructions 7 and 7 as amended. Appellant states in his brief that:

"* * * The instruction, as submitted before modification, was a request that the Court declare that Manhattan [appellant] was justified in holding this reserve and that the verdict should be for the defendant. As amended, the instruction merely recited that until there was a final accounting between Hall and plaintiffs [appellees] Orsburn, Manhattan would be justified in holding this reserve."

Therefore, the first instruction would be, in effect, instructing a verdict for Manhattan insofar as this reserve fund was concerned; and the modified instruction was, in effect, telling the jury it should hold for appellant since Hall and appellees had not had a final acounting between them. This would be permitting appellant to retain the disputed reserve fund account because Hall's financial inability to pay the account prevented a final accounting. Appellant also argues that these two instructions should have been given in order to permit the jury to find that appellant was enttiled to deduct from the disputed reserve fund certain attorney fees and court costs. Suffice it to say that the issue of attorney fees and court costs was fully covered by appellant's Instruction No. 10 given by the court. The trial court was correct in refusing appellant's Instruction Nos. 7 and 7 as amended.

We discuss appellant's points 9, 10, and 11 together as they relate to the refusal of the court to give appellant's Instructions Nos. 11, 11 as modified, and 12. The subject matter of these instructions was sufficiently cov-

ered by instructions given by the court. The trial court is not required to duplicate instructions. *Goodin* v. *Boyd-Sicard Coal Co.,* 197 Ark. 175, 122 S. W. 2d 548.

Appellant's final contention is that the jury verdict is contrary to the undisputed evidence and unsupported by the facts. On appeal we review the evidence in the light most favorable to the appellee and we must affirm if there is any substantial evidence to support a jury's verdict. *Jarrett* v. *Matheney,* 236 Ark. 892, 370 S. W. 2d 440.

According to the appellees' evidence, the contract was made with the appellant for the purpose of minimizing the risk of losing a large sum of money at any one time since its reserves were not large enough to withstand a substantial loss from nonpayment of accounts receivable; that after several lengthy conferences the contract was made guaranteeing the credit of appellees' customer, Hall, not to exceed $50,000.00 due only to Hall's financial inability to pay his accounts. Witnesses testified that from their business experience with Hall he was financially unable to pay his accounts. Appellant requested appellees to continue shipping to Hall, even though delinquent, in order to give appellant more time to collect the delinquent accounts purchased by appellant. Remittances on the reserve fund were not made twice a month as required. It is undisputed that at the time of this litigation the total amount owed by Hall was $39,-356.72. According to the appellees' evidence and their theory of the contract, this balance was guaranteed by the appellant since it was below the $50,000.00 credit limit. According to the appellant, this indebtedness was with recourse and could be charged back to its client, the appellees, because the six invoices representing this total were accepted at a time when the Hall account exceeded the credit limit. These conflicting versions were submitted to the jury under proper instructions and the jury resolved the issues in favor of the appellees. We think there were substantial evidence to support its verdict.

On cross-appeal the appellees contend that the accounts receivable agreement, or factoring contract, constitutes a contract of credit insurance; that the court erred in holding to the contrary, and since the appellees recovered the exact amount sought, the trial court should have awarded a 12% penalty and attorney's fee as required by Ark. Stat. Ann. § 66-3238 (Supp. 1963). In support of this contention the appellees, cross-appellants, rely upon Ark. Stat. Ann. § 66-2002 and § 66-2405 (Supp. 1963). We cannot agree with this contention.

In the case at bar the appellant agreed to purchase without recourse the Hall accounts receivable not to exceed the amount of $50,000.00 for a charge of .85 of 1% of the net amount of the accounts so purchased provided Hall's nonpayment was due to his financial inability. We are of the view that the appellant is engaged in a type of financing business rather than in the insurance business.

The business of credit insurance (orginally called "commercial insurance") has existed for many years. The usual form is that for a stated premium paid by the insured, the insurer guarantees the payment, in whole or in part, of the account which the insured has listed under the policy. See Black's Law Dictionary, "Commercial Insurance"; Cowles v. Guaranty Co. (Wash.), 72 P. 1032, 98 A. S. R. 838, 44 C. J. S. p. 494, "Insurance", § 48; and 44 C. J. S. p. 547, "Insurance", § 68. The factoring business, as involved in this case, is of comparatively recent origin, and is entirely different from the word "factor" which has long been understood as slightly different from agency. G. H. Hammond Co. v. Joseph Merc. Co., 144 Ark. 108, 222 S. W. 27; Burke v. Napoleon Hill Co., 134 Ark. 580, 202 S. W. 827. See, also, "Factors" in 35 C. J. S. p. 494 et seq.

"Factoring", such as the appellant's business, is defined in Webster's New Third International Dictionary as follows: "The purchase of accounts receivable from a business by a factor who thereby assumes the risk of loss in return for some agreed discount." In

35 C. J. S. 493 there is this statement: "Factoring. A practice or system of commercial financing, confined principally to the textile industry, which involves notice to trade debtors, being thus distinguished from the business of 'non-notification financing.'" The only case cited in C. J. S. to support the above quotation is *Corn Exchange Bank* v. *Klauder,* 318 U. S. 434, 87 L. Ed. 884, 63 S. Ct. 679, 144 A. L. R. 1189, and that case affords us no aid in distinguishing between credit insurance and financing of accounts.

We are of the view that factoring is the "purchase of accounts receivable" and that "purchasing" is certainly different from "insuring". We think that appellant is engaged in the system of financing by purchasing accounts receivable just as many f i n a n c e companies are engaged in the purchase of notes, sometimes with recourse and sometimes without recourse, and in such transactions frequently there is a reserve maintained for the protection of the finance company and this reserve, or part of it, is subject to being returned to the dealer or individual who sold the note to the finance company. Some of the cases with respect to finance companies are: *General Motors Acceptance Corp.* v. *Jerry,* 181 Ark. 771, 27 S. W. 2d 997; *General Motors Acceptance Corp.* v. *Sanders,* 184 Ark. 957, 43 S. W. 2d 1087; *Hare* v. *General Contract Purchase Corp.,* 220 Ark. 601, 249 S. W. 2d 973; *Schuck* v. *Murdock Acceptance Corp.* 220 Ark. 56, 247 S. W. 2d 1; *General Contract Corp.* v. *Dodge,* 223 Ark. 476, 266 S. W. 2d 816; and *Commercial Credit Corp.* v. *Kitchens,* 231 Ark. 104, 328 S. W. 2d 355. The only difference between the method of business of the appellant, Manhattan Factoring Corporation, in the case at bar, and the finance companies in the adjudicated cases, is that in the finance cases the dealer always took a note which was assigned to the finance company, whereas, here, the dealer merely sells or assigns an open account.

It is somewhat significant there is nothing in the record to indicate that the Insurance Commissioner of Arkansas has ever considered a factoring corporation;

such as the appellant, to be engaged in the insurance business.

The judgment is affirmed on both direct and cross-appeal.