**ENTERPRISE TOOLS, INC. & E.B. Bennett, Appellees,**

v.

**EXPORT–IMPORT BANK OF THE UNITED STATES, Appellant.**

Nos. 85–1866, 85–2155.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 16, 1986.

Decided Sept. 2, 1986.

Rehearing and Rehearing En Banc Denied Oct. 2, 1986.

See also, 564 F.Supp. 761.

William G. Cole, Washington, D.C., for appellant.

William L. Buffalo, Little Rock, Ark., for appellees.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ROSS, Circuit Judge.

ROSS, Circuit Judge.

This action requires us to determine whether a policy of credit insurance issued by appellant, the Export-Import Bank of the United States (Eximbank), and its agent, the Foreign Credit Insurance Association (FCIA),[1] covered the value of certain assets which were confiscated by a foreign government. Appellees, E.B. Bennett and his wholly owned company, Enterprise Tools, Inc., purchased a "comprehensive services export credit insurance policy" in 1980 in connection with petroleum hauling operations to be conducted in Mexico. In order to conduct the fuel transport servic-

---

**1.** FCIA is an unincorporated association of insurance companies which, pursuant to 12 U.S.C. § 635(c)(2) (1982), acts as an agent for Eximbank in making available export credit insurance to United States exporters. *See Lovell Mfg. v. Export-Import Bank of the United States,* 777 F.2d 894, 895–96, 899 (3d Cir.1985); *Gensplit Finance Corp. v. Foreign Credit Ins. Ass'n,* 616 F.Supp. 1504, 1505–06 (E.D.Wis.1985).

es, appellees created a Mexican entity, Sociedad Transportadora de Gas y Diesel de Reynosa, S.A. (Gas Transport), which contracted directly with the Mexican government-owned oil monopoly, Petroleos Mexicanos (Pemex), which needed the transport services. Appellees provided ten trucks for the purposes of the enterprise and held a financial interest in Gas Transport.

Within less than a year after hauling operations began, most of the trucks were seized by agencies of the Mexican government, and appellees have been unable to recover them. Appellees, as the insured,[2] sought to recover the value of the confiscated trucks from Eximbank under the policy. Eximbank denied coverage on the ground that the insurance policy covered only credit losses caused by any of a comprehensive list of enumerated risks such as customer default, currency inconvertibility, war or expropriation, but did not cover the value of the insured's assets (other than accounts receivable) lost through any of the enumerated hazards. The district court found the policy ambiguous and construed it as asset protection as well as credit protection insurance. Because we conclude that the policy did not provide coverage for the value of the insured's confiscated equipment, we reverse.

Normal principles of contract interpretation apply to the construction of insurance policies. 2 COUCH, CYCLOPEDIA OF INSURANCE LAW § 15:1 (2d ed. 1984). Words and clauses are to be given their ordinary meaning and effect, and resort to extrinsic evidence is appropriate only to resolve ambiguities. *Id.* § 15:3. Whether an insurance contract is ambiguous is a question of law. *Id.* Policy language is ambiguous if it is "reasonably susceptible of two interpretations." *Pearce v. General American Life Insurance Co.*, 637 F.2d 536, 539 (8th Cir.1980). On the other hand, where a term is defined in the policy, the court is bound by the policy definition. *Id. Accord* 2 COUCH, *supra*, at § 15:4. Clauses must be read in context. *Verlo v. Equitable Life Assurance Society of the United States*, 562 F.2d 1034, 1036 (8th Cir.1977). Ascertaining the parties' intent as expressed in the policy is the object of construction of the document. 2 COUCH, *supra*, at §§ 15:9–15:11. While ambiguities are to be construed in favor of the insured, a court may not rewrite the contract. *Id.* at § 15:10.

The Eximbank policy provided two types of coverage: "Coverage A—Commercial Credit Risks" and "Coverage B—Political Risks." Coverage A indemnified the insured for "loss"[3] incurred in connection

**2.** We refer to E.B. Bennett and Enterprise Tools, Inc. collectively as "the the insured."

**3.** The policy definition of "loss" was as follows: *"loss,"* except as hereinafter provided, means:
1. with regard to *covered services* performed for the *customer,* the contract payment value thereof less:
    (a) discounts or other similar allowance;
    (b) any amount which, prior to the time of payment by the Insurers hereunder, the Insured has received from any sources as or towards payment of the *contract payment* including realization of any security and resale of the services; (c) any amount which the *customer* would have been entitled to take into account by way of payment, credit, set-off or counterclaim and any sums or credits which the Insured is entitled to appropriate as or towards payments of the *contract payment;* and (d) any expenses saved by the Insured by the non-payment of agent's commission or otherwise;
2. with regard to *covered services,* commenced but not fully performed (through no

fault of the Insured), the *contract payment* therefore
(i) less:
    (a) value of *covered services* not performed;
    (b) discounts or other similar allowances;
    (c) any expenses saved by non-fulfillment of the *service contract;* and
    (d) any amount which, prior to the time of payment by the Insurers hereunder, the Insured has received from any sources as or towards payment of the *contract payment* including realization of any security and resale of the services;
(ii) plus such other costs as may be specifically agreed upon and approved by the Insurers in the Declarations;
3. with regard to the additional charges specified in subparagraph 2b(2) of Coverage B—Political Risks, the actual amount of such charges, less any allowance, rebate or refund to which the Insured is entitled by reason of the interruption or diversion.
"Loss" thus meant the failure of the insured's overseas customer to make the full contract

with "covered services" caused by the "customer's" (1) insolvency or (2) substantially overdue payment of amounts owed the insured under the "service contract." A reading of the contract in its entirety, particularly the definitions, establishes that "covered services" referred to the petroleum hauling services undertaken for Pemex; that the "customer" meant Pemex, and that the "service contract" referred to the agreement between the insured (via Gas Transport) and Pemex.

Coverage B included two subsections: "1. Transfer Risk" and "2. Other Political Risks." Transfer risk contemplated the loss of contract payments to the insured caused by the inability of the customer's government to transfer local currency into United States currency. The Coverage A commercial credit risks and Coverage B(1.) currency convertibility risk are not at issue in this case. However, Coverages A and B(1.) unambiguously indemnified the insured only for unpaid contract payments, i.e., accounts receivable, rendered uncollectible or remaining uncollected by the insured from Pemex because of commercial and convertibility events. These sections included no language which could possibly be construed to extend beyond credit losses to indemnification of equipment losses.

Appellees rely on portions of Coverage B(2.) "Other Political Risks" for their position that the policy covered the value of expropriated mobile assets. Coverage B(2.) stated:

**2. Other Political Risks**

a. Eximbank will indemnify the Insured in United States dollars for the percentage stated in the Declarations of the amount of the Insured's *loss* incurred in connection with *covered services* following the occurrence, after *commencement of services,* of any of the following events:

(1) [revocation of export license]; or

(2) the cancellation, under circumstances not due to the fault of the *customer* or any of its agents, of previously issued and valid authority to import into or to perform such services, or the equipment and material necessary to render the services, in the *customer's* country; or

(3) the imposition of any law or of any order, decree or regulation having the force of law or any other governmental action of a like nature which, under circumstances not due to the fault of the *customer* or any of its agents, prevents the import into or the performance of such services in the *customer's* country.

b. Eximbank will indemnify the Insured in United States dollars for the percentage stated in the Declarations of the amount of the Insured's *loss* incurred in connection with *covered services* and caused by:

(1) the occurrence after *commencement of services* of any of the following events:

(a) war [and other similar] disturbance[s]; or

(b) requisition, expropriation or confiscation of or intervention in the business of the *customer* or guarantor by a governmental authority occurring on or before the *due date;* or

(c) the imposition of any law or of any order, decree or regulation having the force of law which, under circumstances not due to the fault of the *customer* or any of its agents, prevents the deposit described in Cover-

---

payment. "Contract payment" was defined as follows:

"*contract payment*" means the amount in United States dollars which the *service contract* requires by its terms to be paid for *covered services* performed, or which would have been required to be paid if the *covered services* had been fully performed, during any *performance period* (plus any insurance freight, transportation, or other charges paid or to be paid in United States dollars by the Insured on the *customer's* behalf and allocable to the *performance period*) but shall not include any cash payments received from the *customer* on or before the date of *commencement of services.*

(All emphasis in original.)

age B, paragraph 1, from being made; * * *

(All emphasis in original.)

While the foregoing language may be slightly ambiguous, (see, e.g., the reference to equipment in subsection 2.a.(2) and to expropriation or confiscation in subsection 2.b(1)(b)) the key to the nature and extent of the insurer's liability lies in the definition of "loss."[4] "Loss," as defined in the definitions section of the policy, meant with respect to fully performed services, the "contract payment" value less certain offsets.[5] "Contract payment" referred to the contract price in United States dollars owed by the insured's customer for the services rendered by the insured. Thus, the "loss" for which the insured was indemnified under Coverage B(2.) was intended to be measured by the dollar amounts owed to the insured under its contract with its customer when political events (e.g., war or confiscation) resulted in nonpayment of the contract price.

Considering the contract in its entirety, an interpretation of Coverage B which limits Eximbank's exposure to reimbursing the insured's uncollectible accounts receivable is consistent with the character of coverage unambiguously established in Coverage A. Similarly, a common sense reading of the policy indicates that the single definition of "loss" in the definitions section had the same meaning for Coverages A, B(1.) and B(2.), although loss of accounts receivable could be triggered by different kinds of events or "risks."

Furthermore, credit insurance policies typically cover only overdue or uncollectible accounts and do not provide asset protection coverage. *See* 9 J. APPLEMAN, INSURANCE LAW AND PRACTICE § 5241, at 126–27 (1981), describing credit insurance as follows: "It relates strictly to indemnification of the insured for certain types of overdue accounts, particularly where insolvency of the debtor is concerned

* * *. [It is] usually purchased by manufacturers or sellers of products to insure that the sudden insolvencies, or failures to pay on the part of purchasers, will not wholly strip them of operating capital and put them out of business." *See also Manhattan Factoring Corp. v. Orsburn*, 238 Ark. 947, 385 S.W.2d 785, 789 (1965): "The business of credit insurance (originally called 'commercial insurance') has existed for many years. The usual form is that for a stated premium paid by the insured, the insurer guarantees the payment, in whole or in part, of the account which the insured has listed under the policy."

The manner in which the premium was computed and its amount are also circumstances to be considered in determining the character of the risk which the parties intended the insurer to assume. 9 J. APPLEMAN, *supra*, § 5241, at 129–30. *Accord U.P. Terminal Federal Credit Union v. Employers Mutual Liability Insurance Co.*, 172 Neb. 190, 196–97, 109 N.W.2d 115, 119 (1961). Premium costs for the Eximbank policy were expressly tied to accounts receivable. Bennett agreed to pay premiums based on a percentage of one-half of one percent of the aggregate contract payment value of the covered services (i.e., of the insured transactions). The policy required him to prepare monthly reports of his gross invoice value from which premium payments were calculated at the rate of $.50 per $100 of then outstanding debt owed to the insured by Pemex. The premiums bore absolutely no relationship to the value of the trucks to be used in the hauling operations.

In addition, the policy limits were based on Bennett's anticipated billings, not on the value of equipment used in the insured transactions. Bennett chose a policy limit of $600,000, representing the maximum in receivables he expected to have outstand-

---

4. See footnote 3.

5. Similarly, with respect to partially performed services (in the event of contract interruption by commercial or political events not the fault of the insured), "loss" meant the "contract payment" less the value of unperformed services, partial payments already made, expenses saved and discounts.

ing at any particular time during the transport operations.

In fact, the services for Pemex grossed only $33,000 during the eight months of operations, resulting in a fee of $166.13 to which an additional $83.87 was added to meet the minimum annual premium of $250 to keep the policy in force. As opposed to the $250 premium which Bennett actually paid for the Eximbank policy, Bennett's insurance agent had received a quotation from a competing insurance group, American International Companies, which did offer expropriation insurance. The annual premium for the American International Companies' expropriation coverage was quoted at $4,894 for Bennett's ten trucks valued at $750,000. The premium for expropriation coverage by American International Companies was calculated as a percentage of the actual cash value of the equipment less the insured's deductible and was unrelated to receivables. Similarly, the liability limit was expressly tied to the value of the equipment, unlike the Eximbank policy.

█ While we are charged with resolving policy ambiguities in accordance with the reasonable expectations of the insured, *Auto-Owners Insurance Co. v. Jensen,* 667 F.2d 714, 721 (8th Cir.1981), Bennett and his insurance agent concededly never even read the Eximbank policy before purchasing it. Had they done so, they would have been alerted by subsection IV.C., "Limitations of Liability," that " * * * the amount of the Insurer's liability with respect to any

one *customer* [would] in no event with respect to either Coverage A or Coverage B exceed the value of the *contract payment,* with respect to which the *loss* has occurred [plus certain costs] * * *." Once again, this provision linked liability to receivables.

Robert L. Charamella, Deputy Vice-President of the export division of Eximbank testified that Eximbank and FCIA offer insurance to United States exporters of goods and services covering billings invoiced by the exporters to their overseas customers, but that neither Eximbank nor FCIA offers any policy covering the exporters' loss of plant or equipment.[6] According to Charamella, other government agencies, e.g., the Overseas Private Investment Corporation, have programs which insure investments in tangible assets overseas as do private insurers, but not Eximbank or its agent FCIA. Nor does Eximbank offer overseas kidnap and ransom coverage which is available privately such as from American International Companies. Thus, Eximbank's "comprehensive" export credit insurance contemplates a multitude of possible events, commercial or political, which could precipitate an insured's credit losses abroad, but does not provide comprehensive coverage for noncredit kinds of losses.

John Willyard, a vice-president with FCIA during 1980–81, similarly explained the character of credit insurance available from FCIA:

FCIA's insurance is designed to protect a company's receivables. And receivables

---

**6.** In an exchange with the district court, Charamella explained the only circumstance in which the value of expropriated equipment would be covered by an Eximbank/FCIA policy:

THE COURT: Do you have any policies that cover the equipment?

CHARAMELLA: No, sir.

THE COURT: In other words, the equipment is—let's just say it's expropriated—it's confiscated when it's down there. There is no policy—in your view, this policy doesn't nor do you understand that Exim provides any coverage against that political risk?

CHARAMELLA: Not so long as the equipment is still in the exporter's hands. It still— the title remains with the exporter. *If the title of the goods are with the foreign buyer and the*

*products are expropriated by the government and that expropriation leads to an inability of the buyer to pay the invoices, then that particular event is covered. The cover relates to billing invoices.* If the exporter has equipment in the country, the Export-Import Bank has no policy which covers the exporter against expropriation of the equipment while it's in the foreign country.

THE COURT: I'm having trouble with that. You mean that the Americans, the people who own and have the title to it, if their property is confiscated there's no insurance—that's not a political risk as far as you're concerned?

CHARAMELLA: That's correct.

(Emphasis added.)

in this case would have been the billings for services actually performed under the contract. Now, receivables can be confiscated, expropriated and nationalized through the buyers being confiscated, expropriated or nationalized or in some other way an eligible claim could occur. However, in the sense of having mobile assets confiscated, expropriated or nationalized, we do not deal in any sort of what we call fixed assets, mobile equipment, overseas plant or other types of fixed assets that might be subject to confiscation, nationalization or expropriation overseas.

■ Having considered the language of the insurance policy and the extrinsic evidence bearing on the parties' intent concerning the nature and extent of coverage, the miniscule premium paid and Bennett's rejection of an opportunity to purchase insurance relating to confiscation of equipment at a much higher price, we conclude that the district court erroneously interpreted the policy. We have also considered appellees' other contentions regarding fraud and admissions by a party opponent and find them to be without merit.[7] Accordingly, we reverse and remand with directions to dismiss the complaint with prejudice.

LAY, Chief Judge, concurring.

Because I believe that the insurance policy's terms unambiguously exclude from coverage the trucks seized by the Mexican government, I agree that the judgment of the district court should be reversed.

---

**7.** In addition, appellees' motion to strike portions of appellant's reply brief is denied. This case was decided without reference to the deposition testimony reproduced in the brief.