**TOWNSENDS OF ARKANSAS, INC., Townsend Farms of Arkansas, Inc., Townsends, Inc. and Townsend Farms, Inc., Plaintiffs,**

v.

**MILLERS MUTUAL INSURANCE CO., Defendant.**

**Civ. A. No. 89–83–JJF.**

United States District Court, D. Delaware.

March 31, 1993.

---

Stephen E. Herrmann, Robert W. Whetzel, and Daniel J. DeFranceschi, Richards Layton & Finger, Wilmington, DE, for plaintiffs.

John Vincent Alexander, Young Conaway Stargatt & Taylor, Wilmington, DE, Ronald B. Hamilton, Cozen & O'Connor, Philadelphia, PA, for defendant.

## MEMORANDUM OPINION

FARNAN, District Judge.

Plaintiffs Townsends of Arkansas, Inc. (Townsends), Townsends Farms of Arkansas, Inc. (Townsend Farms), Townsends, Inc. and Townsend Farms, Inc. filed this action against Defendant Millers Mutual Insurance Company (Millers Mutual) alleging a breach with regard to the terms of a policy of insurance, issued by Millers Mutual, for the period from June 1, 1988, through June 1, 1989. The Court held a bench trial and this Opinion constitutes the Court's Findings of Facts and Conclusions of Law.

### FINDINGS OF FACTS

The parties submitted a Proposed Pre-Trial Order which provided a statement of facts to which the parties stipulated. The following statement of facts will include some of those stipulated facts, as well as Findings of Fact made by the Court.

### The Parties

Plaintiffs Townsends and Townsends Farms are Arkansas corporations with their principal places of business in Batesville, Arkansas. Stipulated Facts, Nos. 1, 2. Plaintiffs Townsends, Inc. and Townsend Farms, Inc. are Delaware corporations with their principal places of business in Millsboro, Delaware. Stipulated Facts Nos. 3, 4. Townsend Farms is a wholly-owned subsidiary of Townsends. Townsends and Townsend

Farms, Inc. are wholly-owned subsidiaries of Townsends, Inc.

Defendant Millers Mutual is a Pennsylvania corporation with a principal place of business in Harrisburg, Pennsylvania. It is authorized to transact insurance business in the states of Delaware and Arkansas. Stipulated Facts, Nos. 5, 6.

### The Batesville Operation

Townsend Farms and Townsends own and operate a poultry operation in Batesville, Arkansas. Stipulated Facts, Nos. 9, 10, 12. At the Batesville facilities, Townsend Farms operates a hatchery to hatch the baby chicks. Townsends operates a poultry processing plant, in which chickens are slaughtered and processed to produce poultry products called "dressed poultry." Stipulated Facts, Nos. 13, 14, 19.

Townsend Farms also owns and operates a feed mill to manufacture chicken feed at the Batesville facility. The chicken feed consists of grains, foodstuffs, and other ingredients including: (1) milo; (2) liquid fat; (3) fish, poultry and/or soy meal; (4) phosphate; (5) propak, a protein-based additive; and (6) choline, a vitamin additive. Tr., A–20, lines 8–15; A–59, lines 2–7; D–93, lines 17–25; D–94, lines 1–3.

Milo, one of the grains used in the manufacture of the feed, represents approximately 65% of the total feed. Transcript, A–17, lines 23–25. The Batesville facility purchases the milo from various brokers in the state of Arkansas, who ship the milo in bulk to Batesville on a daily basis. The feed mill operation uses an average of eight to ten truckloads of milo each day. Upon delivery of the milo, Townsends Farms normally conducts two tests: a bushel weight test and a moisture test. Tr., A–56; lines 24–25; A–57, lines 1–9. The delivered truckloads of milo are initially placed in a whole milo receiving bin. Then, the milo is augured into one of four milo holding bins. Three of the bins hold 9,000 bushels of milo and one of the bins holds 12,000 bushels of milo. Stipulated fact, No. 17. The milo from the four holding bins is ground into very tiny particles in a hammer mill and then transferred by elevator to a ground milo holding bin. Stipulated Fact No. 18.

Next, the ground milo is transferred from the holding bin to a scale hopper in which it is mixed with the other feed ingredients. Tr., A–17, lines 18–25, A–70, lines 21–25; A–71, lines 1–12. All of the chicken feed ingredients in the scale hopper are mixed in a 2,000 pound mixer. The ground milo is drawn out of the bottom of the bin, Tr., A–20, lines 2–7, which means that the facility uses the ground milo on a "first in, first out" basis.

Finally, the mixed ingredients are elevated into another bin and made into pellets in the pellet mill. Tr., A–18, lines 1–4; A–71, lines 13–25; A–72, lines 1–2. The pelletization process involves heating the chicken feed ingredients to 190° and pressing them into a one-quarter to one-half inch long pellet. Tr., A–18, lines 5–11; A–71, lines 13–25; A–72, lines 1–2. The pellets are transported by elevator into finished feed bins. The finished feed product is delivered on feed trucks to approximately 400 contract growers in the Batesville, Arkansas area and eventually fed to the chickens.

The contract growers supply the chicken houses and labor to raise the chickens. The chickens are raised by these contractors for approximately eight weeks, before they are brought to the Batesville facility's processing plant and converted into dressed poultry. Tr., A–25, lines 9–25; A–26, lines 1–11. The dressed poultry is either stored in a freezer or delivered on the same or the following day in fresh form to Townsends' customers. Tr., A–26, lines 12–15.

### The Incident

On January 6, 1989, Townsends received notification that routine tests by one of its customers, Campbell Soup Company, disclosed that dressed poultry sold to it by Townsends contained residues of heptachlor. Heptachlor is a man-made chemical pesticide commonly recognized as a family of chlorinated hydrocarbons. Stipulated Fact, No. 22. Heptachlor is fat soluble. It will seek out fat and dissolve in it. Tr., A–121, lines 6–9; D–92, lines 14–18. Heptachlor is characterized as a toxin in that it interferes with life processes. Tr., D–88, lines 14–24. From 1988 to early 1989, heptachlor was used to

treat seed and control termites and insects, Tr., A–100, lines 6–8; A–111, lines 6–14, however, in August, 1989, all uses of heptachlor in the United States were prohibited because of its carcinogenic nature. Stipulated Fact, No. 22; Tr., A–108, lines 12–21 (as determined by the Environmental Protection Agency (EPA)). Stipulated. Fact No. 26. Townsends began an investigation in order to determine the extent of the problem and the source of the heptachlor. Townsends sent samples of dressed poultry and retained feed and milo to various testing laboratories throughout the United States. Stipulated Fact No. 26. By January 11, 1989, laboratory results revealed heptachlor residues were present in chickens and in feed samples. Tr., A–33, lines 10–14; A–62, lines 1–16.

On January 12, 1989, Mr. Lucius Forbes Daniels (Daniels), the Senior Vice President for Townsends at the time, closed the Batesville processing plant because, as he stated, "we did not want anything else that was illegal in the mainstream." Tr., A–33, lines 21–25; A–35, lines 3–7. The processing plant did not resume operations until January 24, 1989. Tr., A–42, lines 11–14. During this period, Townsends did not shut down the feed mill operation, Tr., A–45, lines 4–6, but Townsends did notify its customers of the potential presence of heptachlor in its dressed poultry products. Stipulated Fact, No. 28.

From the tests conducted on the milo samples, Townsends eventually identified milo as the suspected source of the heptachlor residues. Townsends speculated that heptachlor-treated seed milo had been delivered to and received by Townsend Farms at some point in November and/or December, 1988, Stipulated Fact, No. 27; however, Plaintiffs still do not know precisely when the heptachlor treated milo entered their feeding system. Tr., A–58., lines 14–20.

### Insurance Coverage

Millers Mutual sells property and casualty insurance and its Agribusiness Department specializes in an agricultural line of insurance. Tr., D–165, lines 20–25; D–166, lines 1–4. As a "direct writer," Millers Mutual uses its own employees for marketing purposes rather than using independent insurance organizations. Tr., D–136, lines 21–25; D–137, lines 1–15.

David Warren Carmean (Carmean), the Vice President of Millers Mutual since 1986, manages the Technical Services Department. His responsibilities include supervision of loss control personnel, representation of Millers at the Mill and Elevator Rating Bureau, and performing staff underwriting functions. Tr., D–162, lines 6–25; D–163, lines 1–5.

Norbert W. Keller (Keller), Treasurer of Townsends, Inc., is responsible for the procurement of insurance for Townsends, Inc., and it was Keller who dealt directly with Carmean with regard to the purchase of insurance for the Batesville facility. In 1986, Keller asked Carmean to prepare a proposal for property insurance that would provide broad coverage for the Batesville and related locations. Tr., D–167, lines 4–21. Carmean submitted to Keller a proposal for insurance coverage for the Arkansas locations, which Keller subsequently authorized to begin effective June 1, 1987, and continuing to June 1, 1988. Plaintiffs' Exhibit 63 (proposal).

Carmean testified at trial that at the termination of the 1987–1988 policy, the parties began a renewal process which involved a visit to all of the Batesville locations, a survey of all the properties, and an update of the information. Tr., D–171, lines 9–21. Subsequent to this review, the Townsends' entities renewed the policy for the 1988–1989 policy term. See Plaintiffs' Exhibit 1.

During the time period June 1, 1988 through June 1, 1989, Plaintiffs held a property insurance policy, Policy No. 50434 (the Policy), issued by Millers Mutual. Stipulated Facts, No. 11. The policy provided coverage for loss at the Batesville facilities in the following amounts:

**Property Damage**
| | |
|---|---|
| (1) the poultry processing plant | $ 750,000 |
| (2) the feed mill | $ 750,000 |
| **Business Interruption** | $1,600,000 |

The business interruption and property damage coverages were each subject to a $25,000 deductible per occurrence. Tr., A–163, lines 20–25.

The terms and conditions of the Policy are set forth in the twenty-five page Mill and Elevator Bureau (MERB) "Agribusiness Insurance Policy General Property Coverage" form. Plaintiffs' Exhibit 1, at 43–69. Section I, entitled "Property Coverages," provides:

We will pay for direct physical loss to Property Covered at the location described in the Declarations caused by or resulting from a Peril Insured. The Perils Insured are defined under SECTION IV—PERILS INSURED, EXCLUSIONS, AND LIMITATIONS.

Plaintiffs' Exhibit 1, at 48. Section IV defines "Perils Insured" as "the cause of loss for which we [Millers Mutual] insure against direct physical loss to property covered." Plaintiffs' Exhibit 1, at 57.

Section II, entitled "Loss of Income Coverages," provides the conditions of coverage:

A. BASIC COVERAGE CONDITIONS

Coverage, as described below, is provided when your business activities are necessarily suspended because of direct physical loss to Property Covered at the described location. The direct physical loss must be caused by or result from a Peril Insured.

Plaintiffs' Exhibit 1, at 51.

The Millers Mutual policy excludes "loss caused by or resulting from ... [t]he release, discharge, or dispersal of pollutants." Plaintiffs' Exhibit 1, at 49, Exclusion IV, A(20)(e)(8) (Contamination Exclusion). The Policy does not define "release, discharge, or dispersal;" however, "pollutants" are defined in the Policy as:

any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled reconditioned or reclaimed.

Plaintiffs' Exhibit 1, at 49, ¶ (B)(12).

Exclusions IV(B)(1)(a) and (c) of the Policy provide:

We will not pay for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other

cause or event that contributes concurrently or in any sequence to the loss.

a. Ordinance, law or regulation. The enforcement of any ordinance, law or regulation:

(1) regulating the construction use, or repair of any property;

(2) requiring the tearing down of property;

(3) requiring the removal of debris; or

(4) regulating the prevention, control, cleanup or restoration of environmental damage.

\* \* \* \* \* \*

c. Governmental action. Seizure or destruction of property by order governmental authority.

Plaintiffs' Exhibit 1, at 61.

### Report of the Loss

On January 13, 1989, Mr. Keller telephoned Millers Mutual to inform them of the heptachlor incident. Mr. Carmean noted that Campbell Soup found that the Townsends' product contained high pesticide levels. By January 31, 1989, Townsends had informed Millers Mutual that it would recall and destroy product from specified Processing Plant production dates.[1]

## CONCLUSIONS OF LAW

### Jurisdiction & Venue

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, and the District of Delaware represents an appropriate venue for this matter in accordance with 28 U.S.C. § 1391.

### Choice of Law

■ Because the Court's jurisdiction over this dispute is based upon diversity of citizenship between the parties, the Court will apply Delaware choice of law rules. *Robinson v. Adco Metals, Inc.,* 663 F.Supp. 826, 830 (D.Del.1987). In Delaware, courts apply the "most significant relationship test" for choice of law questions in contract cases. *Travelers*

---

1. Townsends estimated the number of chickens destroyed at approximately 500,000 and the amount of frozen product destroyed at approximately one million pounds.

*Indemnity Co. v. Lake,* 594 A.2d 38 (Del.Super.1991). In this regard, the Court must determine the applicable law by evaluating the competing interests of the different states, considering the location of the activities involved in the suit as well as each state's interests in the suit.

In this case, the contract in question relates to insurance coverage provided for companies whose core of operations is in Arkansas, and the incident in question occurred in Arkansas. Millers Mutual is an insurer licensed to do business in both Arkansas and Delaware. On these facts, the Court concludes that Arkansas has the most significant relationship to this lawsuit. The relevant activities occurred in Arkansas and certainly Arkansas has an interest in contractual relationship between businesses and insurers in its state. Therefore, Arkansas law will govern the construction of the terms and conditions of the Policy at issue.

### The Issue of Ambiguity

Under Arkansas law, a term in an insurance policy is ambiguous only if it is susceptible to more than one equally reasonable construction.[2] *State Farm Fire and Cas. Co. v. Amos,* 32 Ark.App. 164, 798 S.W.2d 440 (1990). Further, when a term is defined in a policy, the Court is bound by the policy definition. *Enterprise Tools, Inc. v. Export–Import Bank of U.S.,* 799 F.2d 437 (8th Cir.1986).

In a Memorandum Opinion dated February 6, 1991, the Court denied Plaintiffs' first motion for summary judgment. In that Memorandum Opinion, the Court stated that "[t]he language of the insurance contract is clear and unambiguous." Memorandum Opinion, February 6, 1991, at 7. The Court reiterated its view that the language of the Policy was unambiguous when it denied cross-motions for summary judgment in a Memorandum Opinion dated January 31, 1992. Memorandum Opinion, January 31, 1992, at 7. Now, after hearing all the evidence, the Court again concludes that the pertinent Policy language is clear and unambiguous.[3]

### Application of the Policy Terms and Conditions to the "Heptachlor Incident"

Having concluded that the Policy is clear and unambiguous, the Court will apply the terms and conditions of the Policy to the heptachlor incident in accordance with the plain and ordinary meaning of the words utilized in the Policy. In this regard, the central legal issue the Court must decide is whether the cause of the loss suffered by Townsends is a "peril insured" or whether the cause of the loss is excluded by the relevant provisions of the Policy. Specifically, the Court must determine whether Exclusion IV 20(e)(8) and/or Exclusion IV (B)(1)(a), (c) of the Policy apply.

#### a. Cause of the Loss

Although Plaintiffs initially characterized the cause of loss in this matter as "heptachlor contamination," Plaintiffs now assert that the cause of loss is "the inappropriate delivery of heptachlor-treated seed milo" to the Townsends' Batesville facility.[4] Plaintiffs

---

2. The Court's conclusion would be the same under Delaware law because Delaware has adopted essentially the same principles regarding contract construction. "An ambiguity exists only when the language is subject to two or more reasonable interpretations." *New Castle County v. Hartford Accident and Indemnity,* 970 F.2d 1267, 1270 (3d Cir.) (citing *Cherseroni v. Nationwide Mut. Ins. Co.,* 402 A.2d 1215, 1217 (Del.Super.1979)). "When the language of an insurance policy is clear and unambiguous, Delaware applies ordinary principles of contract law." *New Castle County v. Hartford Accident and Indemnity,* 970 F.2d 1267, 1270 (3d Cir.) (citing *Hallowell v. State Farm Mut. Auto Ins. Co.,* 443 A.2d 925, 926 (Del.1982)).

3. Since the Court has concluded that the language of the subject policy is not ambiguous, the Court will exclude and not consider evidence presented by the Plaintiffs regarding ambiguities they contend exist in the Policy.

4. Plaintiffs presented the testimony of Leonard Silver (Silver), an insurance expert, and Dr. Forsythe, a poultry expert, in support of their position. Silver testified on direct examination that the cause of the loss was "the wrong delivery of the wrong product to Townsends." Tr., B–16, lines 21–24. Although Silver's testimony regarding the latent ambiguity of the contract has been excluded, the Court has considered his testimony with respect to the cause of the loss. The Court has considered Defendant's objections to Silver's qualifications and concludes that Defendant's objections must be overruled.

argue that the loss resulted when the heptachlor-treated milo was used in the manufacturing process because it led to the inextricable presence of heptachlor in such property. Plaintiffs argue that a direct physical loss occurred to whole milo, ground milo, finished feed, and dressed poultry at the Feed Mill and/or the Processing Plant, which, according to Plaintiff, are all covered property.

Defendant counters that the cause of the loss was heptachlor contamination. In support of its argument, Defendant contends that there exists a distinction between a peril and a hazard in that a "peril is a cause of loss" and a "hazard is a condition that increases" the likelihood of loss from a peril. Defendant's Proposed Findings of Facts and Conclusions of Law (Defendant's Opening Brief), at 86. Tr., B–52, lines 17–24; B–53, lines 9–18. Defendant asserts that "inappropriate delivery" is not a peril, and therefore, cannot be cause of loss by itself. Defendant's Opening Brief, at 86. Defendant points out that:

> Even Mr. Silver was forced to acknowledge that "inappropriate deliver (sic)," in and of itself, was not the cause of plaintiffs' loss because the inappropriate delivery must lead to damage before a loss can be said to have occurred.

Defendant's Opening Brief, p. 86; Tr., B–54, lines 22–25; B–55, lines 1–20.

Defendant also argues that the milo was "damaged" when it was contaminated with heptachlor, which occurred before the milo came on to the Batesville facility. Accordingly, Defendant argues that the milo was not covered property at the time of the loss.[5]

The Court finds the testimony of Plaintiff's expert, Mr. Silver, persuasive. Mr. Silver testified that heptachlor in chicken feed and in dressed poultry constitutes a contaminant. Tr., B–49, lines 8–10. He also testified that inappropriate delivery plus the mixing with untreated milo constitutes the loss in this case. Tr., B–54, lines 5–25; Tr., B–55, lines 1–20. The Court then asked Mr. Silver how he would characterize the occurrence in this case. Tr., B–85, lines 12–13. Mr. Silver responded that it was an instance of "[d]elivery of the wrong product and contamination as a result thereof and with it."[6] Tr., B–85, lines 12–15.

Supporting Mr. Silver's opinions is Dr. Kroger, a Professor of Food Science and witness for Defendant. Dr. Kroger testified that because heptachlor is a carcinogen and an insecticide, its presence in chicken feed constitutes a contaminant. Tr., D–88, line 25; D–89, lines 1–17.

Based on the testimony of Mr. Silver and Dr. Kroger, the Court concludes that the cause of the loss was heptachlor contamination, i.e., the mixing of the heptachlor-treated milo with the other chicken feed ingredients.

### b. *Is the Cause of Loss Insured or Excluded?*

█ However, still unresolved is the question of whether heptachlor contamination is a peril insured or whether the Policy excludes such contamination from coverage. Defendants maintain that such contamination is specifically excluded under the Policy pursuant to Exclusion IV A(20)(e)(8). Defendant has the burden of proof with respect to the issue of exclusions from the Policy.

Defendant contends that the heptachlor incident is not covered because it is included

---

5. Plaintiffs contend that the treatment of the milo with heptachlor does not, by itself, constitute heptachlor contamination because at the time heptachlor-treated milo could be used for seed purposes. Tr., A–100.

6. The Court notes that the only tests conducted by Townsends upon the receipt of truckloads of milo were a bushel weight test and a moisture test. Such tests do not indicate whether or not the milo has been treated with heptachlor or other insecticides. Further, Defendant points out that the testimony of Mr. Silver that the "improper shipment" of heptachlor-treated milo caused the loss conflicts with the undisputed testimony of poultry experts for both parties. Defendant argues that the poultry experts testified that:

> it is completely impossible to determine:
> (1) how many heptachlor-contaminated truckloads of milo were actually received at the Batesville facility, or (2) the specific date or dates upon which such shipments were made to Townsend Farms.

Tr., A–118, lines 7–15; A–120, lines 11–25; A–121, lines 1–5; A–130, lines 5–23; D–98, line 25; D–99, lines 1–23.

within the "contamination exclusion" which states that Defendant "will not pay for loss caused by or resulting from . . . [t]he release, discharge, or dispersal of pollutants." See Findings of Fact, supra, at p. 8; Exclusion IV, A(20)(e)(8). Defendant reasons that since the definition of pollutants includes chemicals, and heptachlor is a chemical, the dispersal of heptachlor through the feed manufacturing process led to the loss in question.

Plaintiffs argue that the "contamination exclusion" of the policy cannot apply to the facts of this case because no "release, discharge, or dispersal of pollutants" occurred. Plaintiff argues that the terms "release, discharge or dispersal" are environmental terms of art which should be construed narrowly to refer to pollution of the environment, be it land, water or the atmosphere.

Plaintiffs rely on the testimony of Dr. Forsythe, their expert in poultry science, to support their argument. Plaintiffs point out that the Court inquired of Dr. Forsythe, "what would you use to describe heptachlor [f]inding itself either in the milo or throughout the process?" Dr. Forsythe responded, "[w]e would say that it was thoroughly mixed throughout." Tr., A–137–138. Dr. Forsythe continued, "[i]n my professional judgment, Judge, it's not released or dispersed in the sense that we should normally think of in the environment." Id.

In response to Plaintiffs' interpretation of the terms release, discharge, and dispersal, Defendant argues that the Policy would not exclude pollution of land, water, or air, because these parts of the environment are not "property covered" in the first place. Defendant's Opening Brief, at 102.

Based on the testimony of each party's expert witness, the Court concludes that heptachlor is a chemical, and because the definition of pollutants includes chemicals, the Court concludes that heptachlor is a pollutant under the language of the Policy.

The terms release, discharge, and dispersal are not defined in the Policy, however Mr. Silver, Dr. Forsythe and Dr. Kroger all testified as to their understanding of the meaning of each term. Mr. Silver testified that re-

lease, discharge, and dispersal are terms of art for environmental laws and regulations. Tr., B–19, lines 9–17. He testified that release usually refers to some kind of leak. Tr., B–84, lines 16–19. According to Mr. Silver, discharge requires some force behind it, and dispersal involves a greater spreading throughout the ambient environment. Tr., B–84, lines 17–21.

Dr. Forsythe agreed with Mr. Silver that dispersal means to "move or scatter in different directions." Tr., A–134, lines 24–25; Tr., A–135, lines 1–2. He also agreed that the release means an "unfastening or letting go of something caught or held." Tr., A–133, lines 23–25. Dr. Forsythe testified that in his industry these terms would not apply to the mixing of heptachlor with other ingredients.

The Court inquired of Dr. Forsythe regarding what words, in the context of the industry, would adequately describe "heptachlor (sic) binding itself either in the milo or throughout the process?" Tr., A–137, lines 5–9. Dr. Forsythe answered "[w]e would say that it was thoroughly mixed throughout." Tr., A–137, lines 10–11. Specifically, Dr. Forsythe stated that the concept of dispersal relates to aerosols. Id. He further testified that the mixing of heptachlor throughout the feed manufacturing process is not a release or dispersal "in the sense that we would normally think of in the environment." Tr., A–137, lines 21–25.

Defendant's expert, Dr. Kroger, testified that because heptachlor is a lipophilic, or fat-soluble, substance it seeks out fat and dissolves in it. Tr., D–92, lines 17–18. Dr. Kroger testified that if heptachlor-treated milo were mixed with substances containing fat, the heptachlor would disperse throughout the mixture to seek out the fat. Tr., D–92, lines 20–25.

After weighing each expert's testimony and applying it to the facts of this case, the Court concludes that heptachlor, a pollutant, was "dispersed" through the chicken feed manufacturing process. A certain amount of heptachlor-treated milo was placed in the milo bins and then dispersed throughout the milo bin contaminating untreated milo. Then, the contaminated milo was mixed with

other feed ingredients, further dispersing the heptachlor throughout the chicken feed. In sum, the Court concludes that the dispersal of the heptachlor, a pollutant, is excluded under Exclusion IV, A(20)(e)(8) of the Policy.

***Ordinance, Law or Regulation Exclusion and Governmental Action Exclusion***

 Defendant also argues that the "heptachlor incident" is excluded under Exclusion IV(b)(1)(a) and (c) of the Policy, which excludes losses resulting from the enforcement of any ordinance, law, or regulation and losses resulting from government action. Defendant contends that "Plaintiffs' recall and destruction of its adulterated poultry was nothing more than compliance with a mandatory federal statute, ..." Defendant's Opening Brief, at 112. Defendant points out that government standards in 1988 and 1989 precluded levels of heptachlor greater than .3 parts per million. Tr., A–64, lines 12–25. Defendant argues that the recall of dressed poultry products by Plaintiffs was in response to the federal Food Safety and Inspection Service's request. Defendant's Opening Brief, at 113 (citing Tr., A–87, lines 16–23).

Plaintiffs respond that Defendant has failed to prove a factual basis for the application of the Ordinance, Law or Regulation Exclusion or the Government Action Exclusion of the Policy. Plaintiffs contend that the Ordinance, Law, or Regulation Exclusion only applies when enforcement of such a regulation causes the loss, and does not apply to Plaintiffs' voluntary actions. With respect to the Governmental Action Exclusion, Plaintiffs argue that Defendant has presented no evidence of seizure or destruction of Plaintiffs' property as a result of governmental order. Tr., A–47.

The Court concludes that since neither the FDA or the USDA ordered Townsends or Townsend Farms to close the Batesville operations, the Policy exclusions relied upon by Defendant are not applicable to the facts of this case. In support of this conclusion, the Court finds that no governmental body ordered the seizure or destruction of property. Further, the Court concludes that the claimed loss did not result from the enforcement of a statute and, therefore, neither the

Law, Ordinance, or Regulation Exclusion nor the Governmental Action Exclusion applies.

### CONCLUSION

For the reasons discussed, the Court concludes that the cause of the loss in this case was heptachlor contamination. The Court further concludes that heptachlor contamination is not a "peril insured" under the Policy, because it falls within the contamination exclusion set forth in Exclusion IV, ¶ A(20)(e)(8) of the Policy. Thus, the Court concludes that the Policy does not provide coverage for the loss resulting from the heptachlor contamination incident at Plaintiffs' Batesville, Arkansas facilities.

An appropriate Order will be entered.