Larry UNGER, Plaintiff,

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Defendant.**

No. CV 92–4970 (ADS).

United States District Court, E.D. New York.

March 21, 1994.

Daniel S. Komansky, Huntington Station, NY, for plaintiff.

Shapiro, Shiff, Beilly, Rosenberg & Fox by Steven Pepperman and Beth Shapiro, New York City, for defendant Liberty Mut. Ins. Co.

### MEMORANDUM AND ORDER

SPATT, District Judge.

This is an action to recover property damages for losses under a "standard flood insurance policy" ("the policy") resulting from two floods occurring on October 30, 1991 and December 11, 1992. The plaintiff owns a single family residence located at 78 Arizona Avenue in Long Beach in Nassau County.

The following facts were agreed upon by both parties by stipulation:

First, that an insurance policy was issued to the plaintiff Larry Unger and that he paid the premiums for it.

Second, that the policy is a standard flood insurance policy (Plf's Exh. 1).

Third, that a flood occurred at the insured premises on October 30, 1991.

Fourth, a second flood occurred on December 11, 1992. And Mr. Unger likewise suffered a loss to the premises and contents on that day.

Fifth, both of those floods are covered occurrences under the policy.

Sixth, that representatives of the defendant, Liberty Mutual, appeared at the prem-

ises and inspected the premises at each occurrence.

## THE ISSUES

There are two liability issues in this case. The first issue is whether the lower level in the plaintiff's house, where the losses in both floods occurred, is a basement as defined in the flood insurance policy. If the area in question *is* a basement, the policy only covers for rough carpentry and not for the finished areas or the contents. The second issue concerns the proof of loss provision in the policy and whether the plaintiff complied with this provision with regard to the second flood damage of December 11, 1992.

The plaintiff contends that, within the definition of the policy, his house does not have a basement. The defendant contends the area in question *is* a basement within the terms of the policy.

Under Article II of the policy entitled "Definitions," a basement is defined as follows:

"Basement means any area of the building having its floor subgrade (below ground level) on all sides."

In Article V of the policy entitled "Property Not Covered," there is the following language:

"We do not cover and will not pay for damages to or loss of any of the following:

. . . .

F. . . . finished basement walls, floors, ceilings and other improvements *to a basement having its floor subgrade on all sides*, and contents, machinery, building equipment and fixtures in such basement areas; except that, as to this subparagraph (F), coverage is provided in basement areas . . . [for certain equipment]" (emphasis supplied).

In the policy renewal declarations attached to the policy, which, under the definition of "Policy," were part of the policies and specified the details of the insurance provided and the property covered, the "Building" being insured is described as having "two" floors including a "finished basement." The "con-

tents location" to be insured was described as the "basement and above."

The plaintiff contends that there is a driveway that gradually slopes down from the street to a garage and a door to the lower level of his home (see Plf's Exh. 2B), and that the lower door leading to the lower level is above ground level. The plaintiff further contends that the sloping driveway, although below the sidewalk and street, creates a new ground level adjacent to the lower door.

The guidelines promulgated by the Federal Emergency Management Agency ("FEMA") define ground level and excavations below the ground level as follows:

"(1) ground level means the naturally existing grade at the time of original construction.

(2) excavation of the natural grade for some distance away from the structure does not present a basement."

It is undisputed that the plaintiff's driveway was excavated during construction to create access to the garage and entry door to the lower level thereby altering the natural grade. It is also undisputed that the bottom of the lower level doorway is approximately two feet lower than the sidewalk, roadway, and surrounding property.

With regard to the first issue to be determined, the question presented is, when the policy defines a basement as an "area of the building having its floor subgrade (below ground level) on all sides," is "ground level" the sidewalk and street area, as defendant contends or is it the ground level directly and immediately adjacent to the lower level door?

As stated above, the second issue involves the plaintiff's failure to file a proof of loss covering the claim for the contents of the lower level, with regard to the second flood of December 11, 1992.

## THE TRIAL—FINDINGS OF FACT

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) (*see also Colonial Exchange Ltd. Partnership v. Continental Casualty*, 923 F.2d 257 [2d Cir.1991] ).

The house at 78 Arizona Avenue in Long Beach is a two story structure with a garage driveway descending from the street and sidewalk. The lower level is entered by a door near the garage entrance. The photographs in evidence, particularly, Plf's Exhs. 2B and 2C, clearly show that in order for one to enter the lower level, a person must step up one step from the ground area immediately adjacent to the door. These photographs will be annexed to this memorandum and decision. In this regard, the Court notes that although Liberty Mutual investigator Laurie Potts took photographs following the second flood, none were produced at the trial, either on the issue of liability or damages.

The policy renewal of February 20, 1991, (Dft's Exh. C) contains a building description code of 121 and a contents description code of 2. On the reverse side of the form, with difficulty, one can decipher the definitions of these two sets of numbers so as to indicate a basement at the premises. The Court finds that there is no evidence that a reasonably prudent policy holder would turn over the renewal sheet to discover that these numbers refer to a "basement." Moreover, this self-serving portion of an insurance contract, which is adhesive by nature, is not determinative of the crucial issue in this case.

On a document marked "Flood Policy Declarations" and "Renewal," under the designation "Basement Description," is inserted the words "Finished basement and above." This renewal is dated February 19, 1992, subsequent to the first flood. Moreover, the plaintiff testified that he received this document after he had made a claim for the October 30, 1991 flood, which claim was denied, and after he had paid the premium for that policy. In any event, the self-serving declaration in the renewal sheet is also not dispositive.

Nor is the issue determined in any manner by a prior 1985/1986 policy stating that there is "limited coverage on basement" (Dft's Exh. D).

The defendant produced Ciro Capano, a professional engineer, who rendered certain opinions. He explained that the lower level was 1'8" to 2' below grade, a relatively mild decline in a fairly flat area. He was asked by defendant's counsel to explain what he meant by grade:

Q And what is grade?

A Grade is normally taken as the mean elevation of the ground of the surrounding area.

In this case due to the level nature of the area, *it would be taken at the sidewalk* (Tr. at pp. 36–37) (emphasis supplied).

However, defendant's expert conceded that one had to step up to enter the lower level.

Q And when you visited the property did you observe the area you heard described as a driveway?

A Yes.

Q And could you describe that driveway for us?

A That driveway sloped down from the natural grade, approximately one foot eight inches. The driveway sloped down toward the garage door.

Q And the door—the entrance door to Mr. Unger's lowest level, was that at the bottom of the driveway?

A Yes, adjacent to the garage door at one foot eight below the ground level.

Q You heard testimony from Mr. Unger that there was an approximately one or two footstep up at that point?

A Yes. It is common in construction for having water seep into to drudge, for prevention.

. . . .

Q Looking at the concrete, underneath which is the ground, and let's use 2A. As you leave that concrete and enter the lower level of the home, do you step down or step up?

A You step up.

Q Thank you.

So, you are stepping up from the level of the ground outside the door to the lower level of the home?

A You are stepping up—

Q Yes or no.

A Repeat the question.

Q Are you stepping up from the ground to the floor at the lower level of the house?

A Yes (Tr. at p. 40, 59–60).

Mr. Capano testified that in his opinion, the lower level was a basement within the terms of the policy. He also was of the opinion that the lower level was a basement within the provisions of the New York State Building Code. The Court finds that the New York State Building Code definition of a basement, whatever that is, is not determinative in this insurance contract area of the law. A basement is what the parties, by way of their insurance contract, determine it to be. In any event, the New York Building Code has no definition of grade and its definition of a basement is very similar to the insurance policy at issue, namely, a basement means any area of the building having its floor subgrade (below ground level on all sides).

Significantly, Mr. Capano also testified that the policy definition of "basement" made no reference to the level of the street or the sidewalk.

The defendant introduced evidence that on October 15, 1982, the plaintiff filled out an "application for certificate of occupancy" in which he stated that his residence was a "1 family dwelling with finished basement" (Dft's Exh. E). In addition, the plans annexed to the application state that the "basement floor not more than 2 feet below sidewalk." Also, the certificate of occupancy issued on October 28, 1982 (Dft's Exh. F) includes the word "basement."

However, this extrinsic evidence in which the plaintiff may have considered the lower level of his house to be a basement within the lay person's view of what a basement should be, namely, a lower level of the house, is not determinative. The issue here is what did the policy mean by the term "basement." Again, the definition in this flood policy so as to trigger the conditions and exclusions in the policy, is clear, it is: "Any area of the building having its floor subgrade (below ground level) on all sides."

With regard to the second issue, there is a proof of loss requirement in the policy which reads as follows:

I. Requirements in Case of Loss: Should a flood loss occur to your insured property, you must:

. . . .

3. Within 60 days after the loss, send us a proof of loss, which is your statement as to the amount you are claiming under the policy signed and sworn to by you and furnishing us with the following information:

As to the second flood loss the plaintiff retained a public adjuster, Azus & Kanin Associates, Inc., to pursue the claim. The plaintiff concedes that no formal written notice or proof of claim was served on Liberty Mutual with regard to the contents, as follows:

Q Are you contending that someone gave written notice about the contents, Mr. Komansky?

MR. KOMANSKY: Your Honor, I am contending that Mr. Unger's notification of Liberty Mutual of the existence of a flood and damage, their dispatch of a claims adjuster, the claims adjuster inspection of the damage contents, the taking of photographs of same, and Mr. Unger's notice to her at the home that he was expecting payment for that constitutes a claim made under the policy.

THE COURT: Maybe that is so. But my question to you is: Do you claim there was any written notice with regard to the contents?

MR. KOMANSKY: No.

THE COURT: Or written claim with regard to the contents.

MR. KOMANSKY: With regard to the contents, no, your Honor.

Your Honor, I am going to withdraw that statement.

Upon reflection there was an amendment of the complaint, which was done through a stipulation executed by counsel. And our contention that the amendment of the complaint to include the second flood included damages both for structure and for content, and that constituted notice to Liberty Mutual, in addition to that earlier verbal notice.

*Insofar as a direct writing from Mr. Unger or his public adjuster making claim for contents, there was no written contents—written notice from any one of them* (Tr. at pp. 105–106) (emphasis supplied).

The plaintiff did file two proofs of loss dated January 12, 1993 (Dft's Exh. H) and April 21, 1993 (Dft's Exh. I). However, neither proof contains a claim for contents:

Q And is there an amount on that document next to the notation contents?

A No, no note of contents.

Q No contents whatsoever?

A Not to my knowledge (Tr. at p. 148).

However, the Court notes that Liberty Mutual knew that the plaintiff was making a claim for contents. In a letter dated February 4, 1992 from Liberty Mutual to the plaintiff (Plf's Exh. 8), it was stated, "With regard to your contents, no coverage is afforded, as all of these contents were sublevel, as defined above in 'Basement' Article V. Property Not Covered."

## DISCUSSION

### 1. Is the lower level of the plaintiff's home a "basement" within the provisions of the flood policy?

In this Court's view the basement issue in this case is determined by the rulings in the case of *Nelson v. Becton,* 732 F.Supp. 996 (D. of Minn.1990) *aff'd* 929 F.2d 1287 (8th Cir. 1991). In *Becton,* the lower levels of the plaintiffs' homes were damaged on July 23, 1987 when a creek flooded following a torrential rainfall. Each plaintiff held a flood insurance policy similar to the one at issue. As in this case, the defendant claimed that the lower level was a basement subject to the noted exclusions. Crucial to the Court's determination to grant summary judgment to the defendant was the undisputed fact that in exiting the lower level in the plaintiffs' homes one would have to take one or two steps *up* to reach ground level. Conversely, one would have to step down in order to enter the lower level.

Dealing with the identical definition in the same flood insurance policy, the District Court granted summary judgment in favor of the defendant, dismissing the complaints, as follows:

The crux of the present dispute is whether the plaintiffs' homes' lower levels were basements as defined in the SFIP and therefore subject to the basement exclusion.

[1] This Court finds that coverage for the plaintiffs' losses is specifically excluded under the clear language of the policy. Federal common law controls the interpretation of insurance policies issued pursuant to the National Flood Insurance Program. *Sodowski v. National Flood Ins. Program,* 834 F.2d 653, 655 (7th Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 619 (1988). However, standard insurance law principles apply. *Id.*

Because insurance contracts are written by the insurer and offered to the insured in a fixed form, if the language is susceptible to two constructions, the one more favorable to the insured will be adopted. *Aschenbrenner v. United States Fidelity & Guar. Co.,* 292 U.S. 80, 84–85, 54 S.Ct. 590, 592–593, 78 L.Ed. 1137 *reh'g denied,* 292 U.S. 615, 54 S.Ct. 861, 78 L.Ed. 1474 (1934). If the policy language is clear and unambiguous, its natural meaning controls. *Sodowski,* 834 F.2d at 656 (*quoting Hanover Bldg. Materials, Inc. v. Guiffrida,* 748 F.2d 1011, 1013 (5th Cir.1984)).

[2] The SFIP unambiguously excludes from coverage certain losses to a home's lowest level when its floor is subgrade on all sides. Plaintiffs, understandably, would have it another way, but in reality their homes are not true walkouts.[6] *The plaintiffs acknowledge and their own photographs indicate that their homes can only be exited by stepping up to reach ground level. Each plaintiff's home's lowest level is subgrade on all sides.* Plaintiffs make much of the fact that the policy exclusion was not applied to a non-plaintiff neighbor's home. This is true. Full coverage was granted because the neighbor's home is not subgrade on all sides; *at least the*

*side with the exit is at ground level and no step up is required.*

6. In a walkout, the home's lowest level may be below grade on as many as three sides. On at least one side, however, an exit is at ground level.

This Court therefore holds the lower levels of plaintiffs' homes were "basements" as that term is defined by the SFIP. While this Court is sympathetic to plaintiffs' plight, subgrade means below ground level and the definition is not vague or ambiguous. The SFIP's definition of basement must control. The policy exclusion clearly applies to plaintiffs' homes. Accordingly, the federal defendants' motion for summary judgment is granted as to the plaintiffs' remaining claim (emphasis supplied).

On appeal to the Eighth Circuit, the judgment was affirmed at 929 F.2d 1287 (8th Cir.1991). Initially the Circuit Court noted that "the plaintiffs acknowledge and their own photographs indicate that their homes can only be exited by stepping up to reach ground level" and that "each plaintiff's home's lowest level is subgrade on all sides."

The Court then reviewed the policy definition of "basement" with regard to the facts at issue in that case, as follows:

A. We agree with the district court that the basement exclusion provision is unambiguous and that that provision applies to the lower levels of the appellants' homes.

[1] The definition of "Basement" in the policy is straightforward and clear—an area of the building, the floor of which is "subgrade (below ground level) on all sides." Similarly, the "PROPERTY NOT COVERED" provision of the policy unambiguously states that, with exceptions not here relevant, the insurance does not "cover and will not pay for damage to ... a basement having its floor subgrade on all sides...."

The floors of the lower levels of the appellants' homes were subgrade on all sides. *In order to go from that level out to the yard, it was necessary to go up at least one step. The floor levels therefore were subgrade on the rear of the house because their grade was below the ground level at the point of exit. The extent to which they were subgrade, whether 6, 8, or 40 inches,*

*is immaterial under the policy. The only question is whether they were subgrade or at ground level.*

Indeed, the appellants do not contend that the floors of the lower levels of their houses were not subgrade in the rear or attempt to explain *why a floor that is 6 to 8 inches below ground on one side is not "subgrade" on that side.* Instead, they argue that the basement exclusion of the policy was not intended to cover so-called "walkout" basements, which have direct exit to the yard.

Nothing in the policy language, however, even refers to or uses the word "walkout," which appears to be a term used in the real estate business to describe a home of that type. Although the appellants argue that walkouts generally are not considered basements, the question is whether the appellants' walkouts contain basements under the policy definition of the term. "[W]here a term is defined in the policy, the court is bound by the policy definition." *Enterprise Tools, Inc. v. Export–Import Bank,* 799 F.2d 437, 439 (8th Cir.1986), *cert. denied,* 480 U.S. 931, 107 S.Ct. 1569, 94 L.Ed.2d 761 (1987) (citing *Pearce v. General American Life Ins. Co.,* 637 F.2d 536, 539 (8th Cir.1980)). If the walkout side of the basement is subground, it is a basement under the policy.

. . . .

[2] the unambiguous language of the basement exclusion is consistent with the principle that insurance policies should be as clear as possible, so that insureds will know the precise scope of their coverage and insurers will know the precise extent of their liability. *See generally* 44 C.J.S. *Insurance* § 255 (1945). Under the basement exclusion, only limited coverage is provided for the lower level of a house that is subgrade on all sides. Although the appellants stress that only one step upward is required to get from their basements to the yard, *on what reasonable basis should coverage be made to depend upon the number of steps that separated the basement level from the yard?* Under

846

the appellants' theory, would a walkout basement that was 6 steps below ground still not be a basement? (emphasis supplied).

■ According to New York law "the determination of whether a contract is ambiguous—and thus whether parol (evidence) may be considered—is a threshold question of law for the Court" *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988). See also *United States Fire Insurance Company v. General Reinsurance Corp.,* 949 F.2d 569, 571 (2d Cir.1991); *Pantone, Inc. v. Esselte Letraset, Ltd.,* 878 F.2d 601, 605 (2d Cir.1989).

■ Applying the principles of law set forth generally and in *Becton,* this Court first finds that the definition in the policy of a basement is clear and unambiguous. When the terms of an insurance policy are clear and unambiguous they must be accorded their ordinary meaning. *Western World Insurance Company v. Stack Oil, Inc.,* 922 F.2d 118 (2d Cir.1990). Therefore, the Court need not consider extrinsic evidence with regard to the definition of a "basement." This includes the expert testimony of Ciro Capano, the application for a certificate of occupancy, the certificate of occupancy *or* the renewal certificate descriptions.

■ Second, where a term is defined in the policy, the Court is bound by the policy definition. *2 Couch, Encyclopedia of Insurance Law* § 15:1 (2d Ed.1984). Words and clauses are to be given their ordinary meaning and effect and resort to extrinsic evidence is appropriate only to resolve ambiguities. However, as stated above, where an unambiguous term is defined in the policy, the Court is bound by the policy definition. *2 Couch, supra,* at § 15:4; *Appelman Insurance Law & Practice* § 7384.

■ Applying these rules to this case, the lower level of the plaintiff's home is above the level of the ground near that entrance. In the reverse factual situation from *Becton,* one has to step up to enter the lower level and must step down when leaving the lower level.

Further, it is obvious from *Becton* that the "ground level" referred to in the policy defi-

nition, is intended to be that area close and adjacent to the lower level door and not the area of the sidewalk and street, a substantial distance away from the lower level.

Theoretically, under the defendant's theory, if a rural home had a 1000 foot driveway leading from the roadway to the home, slanting downward so that both levels of the home were below the level of the roadway, both such levels would be "basements," even though they were above the level of the ground immediately adjacent to the house. In such a case, according to the defendant's view, the entire above level house would constitute a basement.

Accordingly, the Court finds that the Unger residence lower level is not subgrade or below ground level on all four sides, and, thus is not a "basement" within the purview of the policy at issue.

## 2. As to the proof of loss with regard to the December 11, 1992 flood:

■ Plaintiff's counsel has conceded that no proof of loss was filed for the contents claim in the December 11, 1992 flood. The amended complaint is not sufficient for that purpose. A review of the two proofs of loss filed, dated January 12, 1993 and April 21, 1993 (Dft's Exhs. H and I), confirm that there is no express claim for contents, although the first proof of loss does appear to say "CTS LIST TO FOLLOW," whatever that means. There has been no proof offered to show what that statement means.

There are numerous cases supporting the proposition that the failure to file a proof of loss bars recovery under a Federal Flood Insurance Policy (*See e.g., Wagner v. Director, Federal Emergency Management Agency,* 847 F.2d 515, 520 [9th Cir.1988] [plaintiffs who failed to file proof of loss are barred from recovering under insurance policy]; *Diamond v. Federal Emergency Management Agency, Inc.,* 689 F.Supp. 163, 168 [E.D.N.Y.1988] ["the courts have almost invariably denied recovery where the claimant failed to comply with proof of loss requirements found in insurance policies issued under Federal Programs"] [quoting *Cross Queen, Inc. v. Director, Federal Emergency*

*Management Agency,* 516 F.Supp. 806, 809 [D.V.I.1980]; *Schumitzki v. Director, Federal Emergency Management Agency,* 656 F.Supp. 430, 432 [D.N.J.1987] ["Numerous courts have held that an insured's failure to comply with the proof of loss requirement of a federal insurance policy bars a subsequent action for recovery under that policy"] [citations omitted]).

■ In this case the plaintiff filed a proof of loss in a timely manner, but never listed the contents claimed to be damaged. That decision, presumed to be intentional, would bar any recovery on the part of the plaintiff for contents in the December 11, 1992 flood.

In any event, the contents claim in this case as to both floods is seriously flawed, as a matter of proof, as will be elucidated later in this opinion.

### 3. As to damages:

A review of the policy with regard to damages, reveals the following applicable provisions:

"We insure you and your legal representatives against all 'Direct Physical Loss By or From Flood' to the insured property as defined in the 'Definitions Section' of this Agreement to the *extent of the actual cash value of the property at the time of loss but not exceeding* (1) the cost of replacing the insured building at the time of loss with material of like kind and quality and (2) *the actual cash value of any insured personal property at the time of loss.*

. . . .

### ARTICLE II—DEFINITIONS

'Actual Cash Value' means the replacement cost of an insured item of property at the time of loss, Less the value of physical depreciations as to the item damaged.

.

. . . .

I. Requirements in Case of Loss: Should a flood occur to your insured property, you must:

1. Notify us in writing as soon as practicable;

2. As soon as reasonably possible, separate the damaged and undamaged property, putting it in the best possible order so that we may examine it; and

3. Within 60 days after the loss, send us a proof of loss, which is your statement as to the amount you are claiming under the policy signed and sworn to by you and furnishing us with the following information:

a. The date and time of the loss,

b. A brief explanation of how the loss happened,

c. Your interest in the property damaged (for example, 'owner') and the interests, if any, of others in the damaged property,

d. The actual cash value of each damaged item of insured property after depreciation is deducted from the cost of replacement of the property (unless the policy's 'REPLACEMENT COST PROVISIONS' apply, in which case the replacement cost without allowance for depreciation should be furnished) and the amount of damages sustained,

. . . .

i. The amount you claim is due under this policy to cover the loss, including statements concerning:

(i) The limits of coverage stated in the policy,

(ii) The cost to repair or replace the damaged property (whatever costs less)" (emphasis supplied).

The policy contains the following limits:

| | |
|---|---|
| Building | $31,000 |
| Contents | $10,000 |

In addition, there is a $500.00 deductible as to both the building and the contents as to each occurrence.

Further, Liberty Mutual did pay the plaintiff the sum of $6,607.69 on the construction repair portion of the damages as to the first flood and $6279.34 on the construction repair portion as to the second flood.

One of the problems confronting the plaintiff with regard to damages is that he never established an "actual cash value" for any

loss as to the contents in the October 30, 1991 loss.

Q And you identified that document that has been in evidence as Plaintiff's Exhibit 4.

I will ask you to look at that document. On the second page is the list of the items of contents that you claim was damaged; is that correct?

A Yes.

Q And is it not a fact that there are certain items with no price next to them?

A Yes, there is.

Q And the prices that are there, it was your testimony that those are based upon the actual receipts that you had for those items; is that correct?

A Some of them have receipts and some of them do not as stated on that document.

Q The ones that do not have receipts, were the prices listed based upon your best recollection?

A Yes.

Q And does that document in any way show the dates purchased for any of these items?

A No. But some of those receipts do have dates.

Q And those prices, are those the actual cash value of those items as of the date of the loss?

A I wouldn't know what the cash value would be on the date of the loss. I have receipts that are just the purchase price.

Q I am going to show you again what is marked as Plaintiff's Exhibit 1, under section two, definitions, your attorney underlined it in red. Would you be able to read the definition of actual cash value.

A Actual cash value means, the replacement cost of an insured item of property at the time of loss less the value of physical depreciation as to the item damaged.

Q Have you ever given an actual cash value for your alleged losses of October 30th, 1991, to Liberty Mutual Insurance Company, based upon the definition in the policy?

A No (Tr. at pp. 136–137).

Later in the plaintiff's testimony, on cross examination, he again stated:

Q And does that document in any way show the dated purchased for any of these items?

A No. But some of those receipts do have dates.

Q And those prices, are those the actual cash value of those items as of the date of the loss?

A I wouldn't know what the cash value would be on the date of the loss. I have receipts that are just the purchase price.

Q I am going to show you again what is marked as Plaintiff's Exhibit 1, under section two, definitions, your attorney underlined it in red. Would you be able to read the definition of actual cash value.

A Actual cash value means, the replacement cost of an insured item of property at the time of loss less the value of physical depreciation as to the item damaged.

Q Have you ever given an actual cash value for your alleged losses of October 30th, 1991, to Liberty Mutual Insurance Company, based upon the definition in the policy?

A No.

. . . .

Q Did you ever provide on either of the two losses Liberty Mutual with the actual cash value as required by that section?

A I don't believe that I did (Tr. at pp. 135–138).

### A. As to the October 30, 1991 Flood:

▪ The plaintiff testified to the condition of his lower level after this flood. The water was over two feet deep in the lower level and the contents, including a refrigerator, were destroyed along with the walls, the electrical system, and the baseboard heating.

The plaintiff introduced two lists of damaged contents and construction damage (Plf's Exhs. 3 and 4). The value of the contents, in the total sum of $18,677.05, represents "the dollar value ... directly from the receipts" (Tr. at p. 21).

In addition to the contents set forth in Plaintiff's Exh. 3, is a framed Leroy Neiman lithograph, which was appraised on April 11, 1990, in the sum of $350.00. So that the sum claimed for contents was $18,677.05 plus $350.00 or the total sum of $19,027.05.

Obviously, this measure of damages does not conform to the policy definition of "actual cash value," namely, "the replacement cost ... at the time of loss, less the value of physical depreciation as to the item damaged."

Therefore, the plaintiff has failed to sustain his burden of proof with regard to the claim for damages to or loss of contents arising from the October 30, 1991 flood, and that claim for contents is dismissed.

With regard to the physical damage done to the lower level, the plaintiff testified that "The walls in the entire lower level had to be replaced from the flooring up four feet.... And all the insulation in the walls had to be replaced with new insulation. Some studs I know needed to be replaced. All the electrical was damaged. All the baseboard heating was bad. The vanities were destroyed. Areas to the bathroom were destroyed. Flooring had come up and needed to be replaced. Carpeting was destroyed in the entire lower level, along with linoleum that was in other areas, and some of the tiled areas in the bathroom, to that level of two feet up where the water had maintained its level for some time. The tiles in the bathroom had come off as well" (Tr. at pp. 26–27).

These repairs were made by a general contracting firm known as Craftmasters, in which the plaintiff's brother Scott Unger was the President. The bill for this repair work to the walls, electrical and heating system and other areas of physical damage to the building, was the total sum of $12,840.00. Copies of the receipts for the material purchased by Craftmasters, were offered (Plf's Exh. 5).

Scott Unger, the plaintiff's brother and President of Craftmasters General Contractors, has been in the home improvement business for fifteen years. During that period of time he did renovations and repairs to approximately one thousand homes. After the first flood, he performed the repair work to the lower level, as follows:

Q Would you tell us what you did after the first flood to repair the home?

A The house was damaged extensively and we did all kinds of repair, such as, first of all, we removed all his damage contents, including sheetrock, furniture, rugs, appliances. We removed damaged insulation, doors, carted it all away. Then we rebuilt, replaced all the damaged insulation, two by fours.

THE COURT: Damaged insulation or installation?

THE WITNESS: Insulation.

Two by fours, two by threes, sheetrock, doors, moldings, kitchen cabinets, sink base, bathroom vanity, a new stove and refrigerator. We had to build up the concrete floor which sunk during the flood. And then there is the replacement of baseboard heating, damaged electric, and then taped, spackled and painting.

Q Were you familiar with the condition of your brother's home, the lower level, before the flood of 1991?

A Yes.

Q And what was the difference between the condition before the flood and the condition after the flood?

A Before the flood it was livable, modern. After the flood uninhabitable, totally destroyed.

Q And after you completed your work after the first flood, what was the condition of the home, the lower level?

A Brand new (Tr. at pp. 186–187).

Scott Unger testified that the repair job took three and one-half to four weeks, during which time he was assisted by a helper and that he purchased the material represented by the receipts in evidence. He testified that the price of $12,840 to repair the construction damage was not only "a fair and reasonable charge ... in accordance with the price charged for similar work within Long Beach and Nassau County," but "it was a little less ... being he is my brother" (Tr. at p. 188).

The Court finds that, following the October 30, 1991 flood, the fair and reasonable value

of the repairs to the plaintiff's lower level including walls, heating and electrical systems was the sum of $12,840.00 less the $500 deductible or the sum of $12,340.00. Liberty Mutual has already paid the sum of $6607.69, leaving the net sum of $5732.31 due under the policy.

Accordingly, as to the first flood of October 30, 1991, the Court directs judgment in favor of the plaintiff Larry Unger against the defendant Liberty Mutual Insurance Company in the sum of $5732.31, together with interest from October 21, 1992, the date of the commencement of the action.

### B. As to the December 11, 1992 Flood.

In this claim, there was no proof of claim filed for any contents, so that the plaintiff's claim in that regard is dismissed. Even if there had been a timely and proper proof of loss, the plaintiff failed to prove the value of the contents within the policy provisions.

With regard to his repair or construction claim as to the second occurrence, the plaintiff testified that this flood was worse than the first one:

Q And what happened to your home?

A Again, I was flooded, worse the second time than the first time.

Q And what was damaged in the home?

A The entire lower level was damaged. The walls again needed to be replaced. The insulation needed to be replaced. Electric and heating needed to be replaced. There was no hot water in the entire house. That needed to be replaced. I lost floors, carpeting, tiling. The house needed to be repainted, the lower level (Tr. at p. 86).

Again, the lower level was repaired by Craftmasters, this time for the sum of $17,893.00 (see Plf's Exh. 10). With regard to this loss Liberty Mutual paid the plaintiff the sum of $6279.34 on the construction claim only.

Scott Unger described the scene at the second flood as follows:

Q And what were the conditions of the home, the lower level of the home when you viewed them after the flood?

A Again, like the first one, it was totally destroyed.

Q Give us some detail.

A I walked into the apartment and there was at least three feet, 30 inches to three feet of water which I had to pump out. And basically everything from sheetrock, studs, insulation, doors, carpet, floor, furniture, was destroyed (Tr. at p. 189–190).

In this second job, Scott Unger worked with two or three employees for a period of two to three weeks full time and he did the following:

A The removal and carting away of all damage content, including rugs, appliances, furniture, clothes, etcetera, sheetrock, insulation, studs, doors, vanities, cabinets. We removed the baseboard heat and we replaced new studding, insulation, sheetrock, moldings, doors, vanity, kitchen sink base with overhead cabinets, baseboard heating, damaged electric; supplied a new stove and refrigerator, new storm door and garage door.

Also repaired a cinder block wall that the water blew out from the flood in the garage (Tr. at pp. 190–191).

Again, Scott Unger testified that the agreed price for the work and cost of materials in the total sum of $17,893.00 was lower than the fair and reasonable costs (see Tr. at pp. 192–197).

The Court finds that, following the December 11, 1992 flood, the fair and reasonable value of the repairs to the plaintiff's lower level was the sum of $17,893.00 less the deductible $500, or the sum of $17,393.00. Liberty Mutual has already paid the sum of $6279.00, leaving the net sum of $11,114.00 due under the policy.

Accordingly, as to the second flood of December 11, 1992, the Court directs judgment in favor of the plaintiff Larry Unger against the defendant Liberty Mutual Insurance Company, in the sum of $11,114.00, together with interest from April 1, 1993.

The Clerk is directed to enter judgment in accordance with this decision and order.

APPENDIX