**Monika BECK, et al., Plaintiffs,**

v.

**DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY, et al., Defendants.**

Civ. A. No. C 77–246Y.

United States District Court,
N. D. Ohio, E. D.

March 11, 1982.

James E. Beck, Beck & Tyrrell, Canfield, Ohio, Joseph G. Schweider, Meyers, Stevens, & Rea, Cleveland, Ohio, for plaintiffs.

Richard J. French, Asst. U. S. Atty., Cleveland, Ohio, H. Joseph Flynn, Washington, D. C., for defendant Director, FEMA.

MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

Plaintiff Monika Beck and James H. Beck have filed suit to recover for damages to their dwelling which they allege were caused by mudslide and covered by a flood insurance policy issued through the National Flood Insurance Program. Defendant Director of the Federal Emergency Management Agency has moved for partial summary judgment. The following facts are not in dispute:

---

**2.** I have in mind freelance photography, news reporting, school bus driving, etc.

1. Plaintiff Monika Beck is the owner of real property located at 265 Saw Mill Run, Canfield, Ohio. Her husband, James Beck, is also a party plaintiff. The house on this real property was constructed in 1974 and purchased in 1975.

2. Defendant Director of the Federal Emergency Management Agency (FEMA) administers the National Flood Insurance Program (NFIP).

3. At all material times, the Beck property was insured under a standard flood insurance policy issued through the NFIP.

4. The Beck property is situated at the top of a hill. The normal level of Saw Mill Creek is 30 to 35 feet below the level of the house and 60 to 70 feet to the south, to the rear of the house. At the time the Becks first occupied the house, the hillside behind it sloped at angles varying from about 45 near the top to about 30 near the bottom.

5. In February, 1976, following heavy rains, Saw Mill Creek rose 10 to 12 feet up the slope behind the Beck's house.

6. On July 11, 1976, the Canfield area had a rainfall of three and one-half inches during a one hour period and Saw Mill Creek rose 15 feet up the slope.

7. At no time was any part of the Becks' house inundated with either water or mud.

8. Following the February, 1976, rainfall, and to a greater extent following the July rainfall, the Becks noticed that the slope behind their house was slipping away from the house and toward the creek.

9. As a result of this slippage, the vertical supports for a wooden deck along the rear of the house no longer rested on the ground and about five feet of the foundation of the house was gradually exposed.

10. As the foundation became exposed, the Becks observed cracks in the foundation wall.

11. Following the slippage the top of the slope was less steep. At that time the top of the slope became closer to 30° than the original 45°.

12. During the period when the slippage took place, the ground was muddy. The ground had a higher than usual moisture content. The ground was pliable and gave way when weight was put on it.

13. During the period when the slippage took place, the surface of the ground was undisturbed except at the top of the slope, where the earth moved down and away from the house, and at the bottom, where the earth slid into or toward the creek bed.

14. Three soils engineers investigated causes of the earth movement. The Becks retained one of the engineers and the NFIP retained the other two. The engineers' conclusions were consistent.

15. The earth movement was determined to have been a form of landslide. The accumulation of water in the ground caused the soil to be less cohesive and lubricated the interface between a layer of clayey subsoil and a layer of more coarse silty soil. The loss of cohesion and the additional weight of the water in the soil caused the layer of clayey subsoil (the upper layer) to slide along the surface of more coarse silty soil (the lower layer).

The issue presented by the Motion for Partial Summary Judgment is whether the damages to the Becks' house were caused by "flood" within the meaning of the flood insurance policy issued through the NFIP. The policy defines "flood":

Wherever in this policy the term "flood" occurs, it shall be held to mean

A. A general and temporary condition of partial or complete inundation of normally dry land areas from:

1. The overflow of inland or tidal waters.

2. The unusual and rapid accumulation or runoff of surface waters from any source.

3. Mudslides (i.e., mudflows) which are proximately caused or precipitated by accumulations of water on or under the ground.

B. The collapse or subsidence of land along the shore of lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the cyclical levels which result in flooding as defined in A–1 above.

The regulations governing the NFIP provide that "'Mudslide' (i.e., mudflow) describes a condition where there is a river flow or inundation of liquid mud down a hillside usually as a result of a dual condition of loss of brush cover, and the subsequent accumulation of water on or under the ground preceded by a period of unusually heavy or sustained rain. A mudslide (i.e., mudflow) may occur as a distinct phenomenon while a landslide is in progress, and will be recognized as such by the Administrator only if the mudflow, and not the landslide, is the proximate cause of damage that occurs." 44 C.F.R. § 59.1 (1980).

This court concludes that the slippage of the hillside behind the Beck's house was not a "river flow or inundation of liquid mud."

"Mud" is a "slimy, sticky fluid-to-plastic mixture of finely divided particles of solid material and water." Webster's Third New International Dictionary 1482 (1971). The term "fluid" means "having particles that easily move and change their relative position without a separation of the mass and that easily yield to pressure." *Id.* at 877. The term "plastic" means "capable of being modeled or shaped: susceptible of modification or chance." *Id.* at 1733. "Pliable" and "malleable" are synonyms of "plastic." *Id.*

"Liquid" is defined as that which:

is extremely fluid without being gaseous so as to flow freely typically in the manner of water and to have a definite volume without having a definite shape except such as is temporarily given by a container and such as is readily lost (as by an upset or overflow) and that is only slightly compressible and incapable of indefinite expansion in such a way that constituent molecules while moving with extreme ease upon each other do not tend to separate from each other in the manner characteristic of the molecules of gases. *Id.* at 1319.

It is undisputed that the hillside was muddy. Moreover, the mud was in a plastic state; it was pliable and changed shape when placed under weight. The mud could not be characterized as free flowing or liquid. It did not flow all the way down to the bottom of the slope as a liquid would have. It came to rest in a position of relative stability at a fairly steep angle of 30°. The muddy hillside therefore had a definite shape of its own. The undisturbed surface of the moving mass indicates there was a lack of free movement of the constituent particles.

The Court attaches greater weight, however, to the fact that the mud did not rise and cover any part of the house. "Inundation" is the "rising and spreading of water over and not usually submerged." *Id.* at 1188. The Becks' house was never inundated with either water or mud. A careful reading of the policy and the flood insurance regulations convinces this Court that Paragraph (A)(3) of the definition of "flood" in the policy was intended to insure against an event where mud causes damage in a manner similar to a clear water flood, by entering or covering a structure or forcefully striking against it. Such is not the case here.

The Court finds that the soil movement in question here did not constitute a "flood" within the meaning of section A of the definition of "flood" contained in the standard flood insurance policy issued to the plaintiffs. The motion of defendant Director of FEMA is therefore granted.

IT IS SO ORDERED.